Good morning, Your Honors. May it please the Court, Senator Nalbandian on behalf of Petitioners. I will start with 13-70674, which I believe has very strong basis for being overturned. The BIA made two very big mistakes in that. That's the first petition, correct? Or is this the last one? No, this is the last one, Your Honor. The last petition, okay. I'm sorry. And, Your Honor, the BIA made two very big mistakes in that case. It's cited to Hay v. Gonzalez, stating that it's personal circumstances in this case. However, we feel that Chandra v. Holder, 751-F1034, 9th Circuit, 2014, is basically the case that should govern in this case. There are significant changes. First of all, it's not 2007, as the BIA cited. The last hearing was 2004. So that's what we have to assess, changed circumstances since 2004. It's a different president. It's Serzh Sargsyan. There's a news article published about this respondent in Armenia, about his activities in the U.S. at AR-79. The March 1, 2008, incident where there were demonstrations after the February 19 elections in 2008, 10 protesters, I believe, were killed, and it was extensive bloodshed. It was one of the worst incidents in Armenia's history in terms of political retaliation. That's a new changed country condition. The article — What you're trying to do is link what he did here in the United States to what's happening — Link what he did in the United States as well as the government discovering what he did in the United States, Your Honor. The Armenian government. That's correct. The government in Armenia. Just to refresh my recollection, what exactly happened in the United States? What did he do after — He joined the committee in support of Levon Ter-Petrosyan in 2007, in October, a month after he announced — Mr. Ter-Petrosyan announced his candidacy, and he started doing all of the pre-election campaigning, door-to-door in front of the embassy, he asked photos, and those photos are often seen by the Armenian government. And he continued participating even after the election, all the way up to 2012, when the Armenian doctor, Vahey Avetian, was killed in a political murder. And that was discovered in Armenia. The BIA did not accept, it seems, everything in the statement as true. There's nothing in here that's inherently unreliable, and they had to accept it as true. So therefore, there's significant changes in country conditions and his personal circumstances. It's coupled together. His personal circumstances reflect the changed circumstances and the changed country conditions. His underlying claim is for political activity, right? That's correct. The protected ground is. That's correct. It could also be particular social group in the sense that — of course, we'll get to that in the other petitions with regard to what happened with his father. But in this case. You have to make a prima facie showing on your motion to reopen. That's correct, Your Honor. And that leads. Entitled to asylum or withholding. That's correct. And it is political opinion, the nexus. And there is — the government is targeting him. All he had to do was show prima facie eligibility with his detailed five-page affidavit. It's not just. Was his underlying application based on a social group? No. It was based on political opinion. Political opinion. Well, both boxes were checked on the underlying application, but that's correct. It was political opinion primarily. He was primarily focused on political opinion. That's correct. Because of his political activity. That's correct. I have a question. Was the — did the parents receive asylum — did they — was there asylum? The parents were granted asylum. The brother was granted asylum. What about the wife? His wife, Mr. Asadarian's wife, her case is still pending at the asylum office. It's taking about four years to get an interview these days. So — She's not derivative on his? If he wins, she will be a derivative. But as it indicated in court, because she was not in proceedings, she had to file her own claim for asylum. I see. And — Is her own — is she — is he derivative on hers? Yes. He's derivative on hers, and she is derivative on his, because they are married. And hers is still pending. That's correct, Your Honor. I don't — it's probably not my job to say so, but why are we then — shouldn't we wait and see what happens to hers? Your Honor, basically, in this case — Or is his strong? That's what I was going to say. He has a stronger claim, much stronger claim, I believe, not just based on his family's background, but his own activities. And also, it's taking four or five years to get an interview in Anaheim. They're not even scheduling interviews for the last five months. Let's start it with the last one. I'm just trying to work through what's happened here. The first motion to reopen — there's four motions to reopen here, right? Well, there's the motion to reopen the in absentia order. Right. And then three motions. And then there's the — And that's denied. That's correct. Because the BIA says, well, first of all, you knew about the order, and there's no dispute that he did. That's correct. And, Your Honor — And second, you haven't demonstrated sufficient — sufficient facts to warrant equitable tolerance. That's correct. I can address that, Your Honor. I'm just trying to work through them. So just — Yeah. And then you file two others. That's — And they're supported by what? Well, that's — Because the first — the first one, the Board didn't look at the merits of the claim. It just simply said it's time-barred and you — you can't reopen. You can't reopen the absentia order because there's no good reason to reopen. Now, so what facts — what facts do you allege for two and three? For the — Yeah. What support is there for two and — for motions to reopen two and three, if you will? Well, the third one was a motion to reconsider. That's being appealed. Right. So that's nothing there. That's correct. So look at the second. The second one is basically both boxes. I reviewed it because I was not the attorney at the time, were checked, particular social group and — No, I understand. But what was — what was submitted in support of the application? It was his affidavit, Your Honor, primarily, basically stating that his father — his father had been granted political asylum. Right. He indicated to Mr. Acedrian — we have to accept the fact that's true in this case. There's no adverse credibility finding — that his father indicated he was worried about going back, but he wanted to set a path for his children, given that they're artists and so forth. He went back. Two days later, they hadn't heard from him. Then he was despondent. Five days later, he was killed with a quote, unquote, heart attack. I think circumstances — No, but there's no — Slow down right there. Because you say he was killed, a heart attack. I mean, all that you've been able to show is that he passed away when he was over in Armenia, hasn't it, from a heart attack. Where, I guess — The Board's not required to credit as true your — your client's allegation that he was killed when there's no supporting detail of that, is there? The only — the only — I mean, from what I could see, and this is your opportunity to tell us, but he offered that his dad died from a heart attack. He's wanting to say that he was killed, but is there anything to support that he was killed? Well, Your Honor, if it was basically for the prima facie case, it's — Even from a prima facie case, it seems you've offered that he died from a heart attack. It's circumstantial evidence regarding when he left, how soon it happened, and so forth. There is no direct evidence. I understand. I mean, it's — it's not the same that he went over there and was, you know, shot or — I mean, it's just dying from a heart attack. It might be just, unfortunately, dying from a heart attack. I'm trying to figure out the connection to — to say that he was killed. That's, I think, for me, you know — I understand, Your Honor. And that's why I believe the 13- — the most recent petition is the stronger basis for political opinion. I agree. Yes. I agree, too. But I'm asking these questions, and I think Judge McGeeh is troubled for the same reason, which is the Board said something like, in 13, you're not telling us anything different than you've told us all along, which is that you oppose the regime and may well be persecuted because of it, and you've got to demonstrate that something has changed. So what's — what's changed? Well, Your Honor, the case law is what has changed since the last hearing, which was in 2004. Yeah, but it really doesn't matter whether it's 4 or 7. What's changed since any of them? The government has changed. There's been the March 1, 2008 incident. He's involved politically since 2007 in — with regard to the most recent decision. His brother was accosted by police where they mentioned that they knew about the activities in the United States. Father's death, for the reason that Judge McGeeh said, doesn't strike me as a new fact. It may well be that — it may well be that your speculation is correct, but there's nothing I think the Board was entitled to say. All you have is that he died of a heart attack. That's correct. The incident with the brother in Armenia? The incident with the brother in Armenia, Your Honor, was that the police came to the house. They indicated — they started yelling and saying, your brother is participating politically. Now, a lot of the details came out when he spoke with his brother. The brother did not put it in writing, but it is in the affidavit, detailed five-page affidavit, which, again, we must accept as true. And also, Your Honor, in this case, the Board put an interesting sentence. It says that the available evidence — unavailable evidence is insufficient to meet the heavy burden of showing that it is likely that the result of the proceedings would change if reopened. And they cite the matter of Coelho in 1992. That case dealt with 212C, and that's not the standard. It's prima facie evidence, as Your Honor has indicated. It's not heavy burden of showing that circumstances would have changed. Your Honor, if — since we're discussing the petitions, I can either reserve my time or keep going. Why don't you — why don't you go back? Why don't you just keep going and pick up with the original petition, the ineffective — the one that alleges ineffective assistance of counsel? Yes, Your Honor. And in that case, Your Honor, what we would argue is that, first of all, with regard to the equities, he has appeared three straight years in court, never missed an appearance. He went on the 25th, was told that the court was canceled. He called his attorneys up. Basically, in this case, the crux of it, Your Honor, to sum it up, is whether his testimony had to be accepted as true or the testimony of an attorney who the Ninth Circuit itself had concerns with and was — But the problem here, I mean, it's — it's very troubling because Ms. — is it Ms. Reinhold? That's correct, Your Honor. It's clear she had a lot of issues in the — you know, here in the Ninth Circuit and within the State Bar. But the issue that's very difficult is that your — your client admitted that he was notified of the hearing and that he was ordered removed in absentia. And then a long time passed before he did anything. And so I'm just trying to figure out, isn't that just fatal to his — He admitted that he was notified of the February 25th hearing, not the March 1st hearing, not when it was rescheduled, sua sponte, by the court. That's the — no. He admits that he — well, that he — he admits that he knew that he was ordered in absentia. That's correct. So that's the — that's the critical point, I think, here. You don't dispute that he knew that he was ordered removed. Well, he says that in his affidavit. So we don't — So we have to accept that it's true. That's correct, Your Honor. So he knew he was ordered removed, and how long did he wait to file that first motion to reopen? Well, here's the thing. He retained counsel if that's in — Well, first, let's just — tell me how long. A few years, at least. Okay. So what's the excuse? Okay. So basically, Your Honor, I understand the Court's concern. It's — he ended up retaining a counsel, Sandra Cannon, within that same month, basically. A year and a half, she told him she hasn't filed anything, she's not going to file anything. When was he notified by Ms. Reinhold that she had been with — that she had withdrawn? Was he ever notified? I believe — When he went to see Ms. Cannon, did he know that — I don't think so. That he was no longer represented by — what's her name? That's not clear in the record, from my recollection, Your Honor. That's — So what did he go to see Reinhardt, Cannon, for? What was the purpose of visiting Cannon? Well, because he realized that he had been ordered deported, and he probably felt something was amiss, because he knew there was a court date. And he went to see Cannon, and — But he got another bad lawyer. Exactly. What advice did she give him? She told him she would file a motion to reopen. According to what I see in the evidence, again, I was not the attorney with those She told him she would file a motion. It's not clear if it's an ineffective assistance motion or what kind of motion, but she said she would file a motion to reopen the in absentia order. When was he ever told that he had been the victim of ineffective assistance in counsel? That's a great question, Your Honor. Thank you. The only time that's clear in the record that he was told is with regard to the latest counsel. And under Ninth Circuit law, it's — Which — who was the latest counsel? Well, the one who filed the ineffective assistance, which I believe is Javier Rojas. And when he met — is there any affidavit in the — in the record that says that Mr. Rojas informed me that I had been — you know, if you're looking at all my files in my record, that there had been — I had been the victim of ineffective assistance in counsel? I will check his affidavit again, Your Honor. But from my understanding, since he said he wanted to file a complaint, clearly he knew at that point. When he saw Mr. Rojas. That's correct. And how long before he saw Mr. Rojas until the motion to reopen the in absentia order was filed? I believe it does not say in his affidavit exactly when he retained Mr. Rojas, but it does say it was filed immediately thereafter. So clearly it's within 90 days, I would argue. What's the starting date under our case law for measuring whether somebody — whether there is — Your Honor, Your Honor, we would argue that Mejia-Hernandez and — or actually, Rodriguez-Larry would govern. Basically, it's from the day that it's clear on its face — or, I'm sorry, from the day that there is clear evidence of fraud and the individual has been made known of the ineffective assistance, from the day he has made — he meets with competent counsel, okay, he reviews the record, and he has made known there is ineffective assistance. From then on, the tolling stops. Doesn't — I mean, isn't the — I mean, the thought that the date was once he knew that he was filed — that he was deported in absentia, he had an obligation at that point to diligently try to pursue something. Well, with ineffective assistance, that tolls, Your Honor, the 180 days from the date he — basically, it's — he might find out he was ordered, removed in absentia, but be told there is no motion we can do, like Mr. Sarian indicated and some intervening attorneys. It's from the date he knows he can do ineffective assistance of counsel. He's informed of that. He finds out about the ineffective assistance, and he files his motion. Why hasn't he found out about the ineffective assistance when he sees counsel number two? He's gone — within a month of getting this order, he's aware of the order of removal. He says — I don't know what he says, but it seems to me what he does is he says, oh, my gosh, my lawyer is screwed up here. And he goes and sees another lawyer. Is he entitled to tack on any ineffective assistance that the second lawyer gives him with respect to equitable tolling? Yes, Your Honor, he is. What case supports that? I believe it's Avakian because there were multiple attorneys in that case. Okay. And so what's the evidence that the second lawyer provided ineffective assistance? We know the first lawyer — we don't — we know the first lawyer was disbarred, and so maybe we can presume it. With respect to the second lawyer, what's the evidence of ineffective assistance? With regard to the second lawyer, I would just argue that basically a year — his affidavit stating that she told me she was doing something, I kept inquiring, they said it was pending, and then a year and a half later, we have the record in the file saying I am returning this, this, this, basically withdrawing and saying I'm not going to file the motion, which seems ineffective. Well, help me understand it, because it seems like 8 U.S.C. section 1229AB5C2 says an applicant may file a motion to reopen at any time if he has been removed in absentia and demonstrates he did not receive proper notice of the hearing in which the agency issued the order of removal. So here he admits to having received notice of the removal, separate aside from it looks like the agency had sent him the notice to the last address that they had for him. Doesn't that — isn't that what controls here? Your Honor, basically, that's with regard to if he had not gotten notice or the attorney had not been given notice. In this case, it's the extraordinary circumstances exception, which goes under the 180 days, not the unlimited timeframe. What's the — I'm trying to figure out the authority for that. Well, there's Mejia, Hernandez, Rodriguez, Laris, and Avakian. Say what? Say that basically the 180 days for filing under extraordinary circumstances a motion to reopen based on ineffective assistance of counsel, that the 180 days is told if there is ineffective assistance. So you're — Even though he got proper notice of the — you're saying that even though — those cases say that even though he got notice of the — of the hearing, that he had been removed. He did not — Or not the hearing, just the notice that he had been removed in absentia. That's correct. Because they would still — he wouldn't know that he can do ineffective assistance and that the assistance was ineffective. So you can attack any in absentia order within a certain period of time if you don't have notice. That's correct. Or you can, under your view, bring for exceptional or new circumstances. If he did not. If he did not. So what you're attacking with respect to Order No. 1, if I can, just using it chronologically, what you're saying here is that the Board erred in not finding equitable tolling, right? That is correct, Your Honor. Okay. What's our standard of review of the Board's determination? I believe it's abuse of discretion, if I'm not mistaken, because it's a motion to reopen. And why did it abuse its discretion? Because it did not analyze all of the facts, first of all. The ones we are analyzing today in detail, it doesn't seem like it assessed any of that. It did not accept as true Respondent's statements as to why. And also equitable tolling in the case law, it has to be within a reasonable time. It's not a set in stone. And basically, there was the Board did not address the time frames that he had between the second counsel, the third counsel who told him he can't file a motion. Then there were incidents in his life where he did not get to file the motion within a reasonable time frame because of his father's and his brother's passing. And then he filed as soon as he consulted with Mr. Rojas. So I think the Board did not analyze that from my understanding of the record. And with respect to ineffective assistance counsel, did he comply with the procedural requirements of Lozado, Henry Lozado? He did not, Your Honor, but the case law permits an alien to either substantially comply or if it's clear ineffective assistance on its face in the administrative record and the attorney's withdrawal or she was going to be disbarred, Mr. Reinholz, is ineffective assistance on its face. If there was ineffective assistance, they don't have to comply with Lozado? No. Lozado is ineffective assistance, but if it's ineffective assistance on its face, then they don't need to comply. Yes. They don't need to comply. Ms. Reinhart is clearly a bad attorney. Tell me how she provided ineffective assistance. Well, if she got notice of the hearing date. And didn't give it to him. And didn't give it to him, which is clear from his declaration that he never got notice. He went on the 25th to court. He's gone to every hearing. His parents have asylum. His brother has asylum. He has absolutely no reason not to pursue asylum. In court, those are pretty much slam-dunk cases. Well, with respect to ineffective assistance, don't you also have to show that had he showed up at the hearing, he would have likely been granted asylum? You have to show that he was prejudiced, that either a relief was foreclosed asylum was foreclosed by him not going to the hearing. So it's not that he would be granted asylum. It's that some remedy was foreclosed or that he would more likely than not be granted asylum, which his parents were and his brother were. I know this record doesn't tell me this. At least I can't find it. Were his claims going to be based on the same evidence that his brother and rest of his family? I believe it was based on his political activities and also a particular social group that the parents and the wife. I understand his activities may have been different than his father's. That's correct. Yeah, exactly. In Armenia at the time he came. That's correct. Were different than his father's. That's not clear, as Judge Hurwitz said. That's not clear from the record, Your Honor. But I believe it's similar in the sense that it was the same opposition movement and the same activities. So it's pretty much identical to his father's claim. His father got asylum. That's correct. Okay. Why don't you save some of your time. Sure. For rebuttal. Sure. I'm not sure exactly because we combined the two. So as many as the Court would provide, I would appreciate it. Yes, of course. May it please the Court. I am Annette Witeka, and I represent the Attorney General. I think since we finished with the — since we just finished talking about the first — Sure. — board, we'll talk about — I'll continue talking about that, the in absentia removal order. So Mr. Ossetrian's — he stated very clearly that he found out about the removal order within just a few days. Right. And his — let me just work this through with you because I want to make sure I have it right. He finds out within a few days. Within, I think he says a month, he goes to a lawyer and says, help me. He goes to Sandra Cannon. And says, help me. And she says, according to him, we can file a motion to reopen. Correct. And never does. That's — that's what it appears. Okay. So why — why isn't the time to file the in absentia motion or the motion to upset the in absentia order equitably told during the time, this long time period in which he appears to have received no assistance of counsel at all? Well, he — he's not made the argument that Sandra Cannon provided ineffective assistance. I'm making it. Oh, okay. But I did want to point that out. I understand. I asked him about that, too. Right, yeah. Let's just assume he's making it. Why would it be a bad argument? I mean, if it did, it — I don't know that it would be a bad argument. But once she told him, in November of 2005, she returned the files. And said, I'm not going to file the file. And said, I'm not going to file it. What does he do after that? He then — he waits five or six months, and then he goes to speak with another attorney, Artem Sarian. And then Mr. Ossetrian says in his affidavit, I talked with Mr. Sarian. Mr. Sarian actually requested the file, the case file from the board and got it. And then according to Mr. Ossetrian, he told me, like the other attorney told me, I guess meaning Ms. Cannon, I should file a motion — I should file a motion with the court, but he said he could not do it himself. And then in Mr. Ossetrian's affidavit, he says he spoke to two more attorneys, and they told him, you need to file a motion to reopen. Nothing could be done with my case, according to him.  So let me get back into the microphone. I'm sorry. Push it down so I don't have trouble hearing you. No, I'm sorry. Is that better? Okay. So he — so after — so he — so even if you — you would say that the tolling period, the time should be told while Ms. Cannon was purportedly working on his case, once she told him, I'm not going to file a motion, I didn't file a motion, I'm not going to file a motion, then the time would start to run again. And so that would have been in November of 2005. Then he didn't — then he didn't file his motion until November of 2007. So our case law, when does the time — I thought our case law said that the time doesn't really begin to run until he learns that he's been the victim of ineffective assistance. Until he learns of the ineffective assistance. Isn't that what our case law says? I believe that that's what it says. Right. So he — so — But if you look at all the — if you look at the record here, when does that — under our case law, when does that begin? Well, I would — we would argue that it begin — that it would begin on — when he found out about the removal order, so scarcely a week after March 1st. Why is that? Because he found out that he — How would he know that he was — you know, how could that be? Well, he found out that he — that he was ordered removed in absentia, that he had a hearing, and he — which he says his attorney didn't tell him about. Well, he doesn't — you know, nobody really knows that. Well — well, and we don't know that — we don't know that because Ms. Reinhold didn't have a chance to answer the allegations that she didn't tell him about the notice. And so — Ms. Reinhold was — was — was — That's what I'm trying to figure out. Removed from the bar and — Right. But what we do have — And removed from our bar and the board. Are you trying to say that she — he hasn't established that she wasn't ineffective, or are you saying even assuming that she was ineffective? Because that's where — it's getting a little tricky for me. So which — what argument are you making there? Well, the board — the board didn't address the question of whether she was ineffective. And so — And doesn't his affidavit, which we have to take as true, say she didn't tell me — I thought the hearing was a week later. I showed up. She never told me that the hearing was a week earlier. But she says in her motion to withdraw, so she filed a motion to withdraw her as — as his representative, that her office — this is on page 439 of the — of the 13 docket number record. Her office had repeatedly tried to get in contact with him by mail and by phone, and they were unsuccessful, and that he had been unwilling to cooperate with her office. So we have her — we have her motion to withdraw. We have her motion. And we have his affidavit. And we — I'm sorry. And so why — why isn't his affidavit taken as true? The board — the board surely wasn't measuring the credibility of her motion versus his affidavit, were they? Or if they were, we've got a problem. No. What the board said was, even if it is true that he — that he didn't get notice of the — what the board said was that he wasn't diligent in pursuing this claim, that he didn't get notice. That's a separate issue. Right. So it — right. What Judge Pius asked you is when — and Judge McGeer, too, I think — when should he have known that he received ineffective assistance of counsel from Ms. Reinhart? He says, I showed up at the hearing that was — I showed up on the day that I thought the hearing was scheduled, and I learned that I'd been removed in absentia, roughly at the same time. Should he have known then that he received ineffective assistance, or should he have — I don't know. I'm asking you. I think we would say that when he went to speak with Sandra Cannon, and she told him, you need to file — you know, we'll file a motion to reopen, we don't — we don't — because he didn't comply with the Lozada requirements with her, we don't have any statement from her as far as what she said to him, either. Let me ask just one thing about Ms. Cannon. I — there's hints in the record that Ms. Cannon also had problems with the bar. What — what is in the record is in — I — I did not see her on the list of attorneys that had been suspended before the bar. I checked a couple of — last week, I think. So she was not on the list of practitioners that — that could not practice in immigration court. All we have is what he submitted, what Mr. Ossetrian submitted in his first motion to — the motion to reopen for the immigration judge. She was suspended for a little more than two weeks in 2003 for not paying her bar membership fees. Oh. And it's not even considered a disciplinary action. It's — so this is on page 474 of the record in the 13 docket number. And in the 11 docket number, it's page number 341. It's — it's treated as an administrative action, and it says this member has no public record of discipline. So — And — and let me give you the — a big-picture question and see if you can — we can work backwards to it. What's disturbing about this case is that this petitioner appears to have a good case for asylum because everybody else in his family seems to get it. He doesn't show up at his hearing, and then the world goes crazy for him, some — in some respects because he's not diligent enough, in some respects because his lawyers aren't diligent enough. But I have the sense that had this hearing been held on time with competent counsel, he might well have gotten asylum. Well, I'll just add, I mean, it seems like it's — it's a little disconcerting here because there was never a hearing on the merits. No one ever made a merits determination of his application because he was ordered removed in absentia. Is that correct? That's correct. So — And all the later ones are sort of it's not enough to overcome it. And then we have — you know, so then he's — you know, they have to look at the record they have before them when they're making — when Mr. Strand makes the motion to reopen, so it just — it just gets compounded for him. But it seems like this case, and I've never, you know, asked for this in open court, but I just wonder if the government would consider mediation in this kind of case. Considering the history here, I'm always a little nervous when it comes to talking about mediation because of the confidentiality. I mean, we certainly could — we certainly could consider mediation again as far as a substantive remand would be concerned. Say again. Has it been considered before? Has it? No, you don't have to. Sorry. If you don't tell us anything, you shouldn't. Okay. But you see the disturbing part of this case on the surface, which is that we have a series of errors for somebody who appears like he might well have received relief had he not had bad lawyers. Now, that doesn't — you know, those — we have to — we have to analyze those independently. And perhaps the first motion to reopen wasn't entitled to equitable tolling. And perhaps the second and third really didn't contain enough new information, and perhaps the fourth didn't either. So analyzing them independently, you know, your case may well be strong. When I look at the equities of this, without any of the knowledge that you have, I worry that this may be a case where procedures have prevented the same result that would have occurred for the rest of the family. How do you respond to that? Well, there — And don't tell me anything you shouldn't, but that's — that big picture troubles me, and you're in the business of doing justice because you're the Department of Justice, right? Right. Right. Well, this will be the case in almost every in absentia removal order, is that the merits won't be heard. No, but the difference here is the merits were heard with respect to other family members for whom his claim appears to be quite similar. It's similar. We don't know that because, you know, the record is not developed. We don't know. We don't know that it would be similar, or we don't know that his circumstances would be the same. We don't know that it's a, you know, a foregone conclusion that he would have been granted asylum. But there — Sorry, go ahead. There has to be — there has to be an incentive to show up. Sure. Which he — which he does, which he says that he had the incentive to show up. But then there also has to be the incentive to be diligent in pursuing your claims, because otherwise you'll have Petitioners trying to come back. Well, you know, it's such a — well, I don't want to — In this case, though, he had shown up for the prior hearing. It was continued, right? Correct. Correct. So, I mean, this record may be different than other in absentia removals. I mean, there are cases, right, where they do show up, but — And so do you challenge — I'm just curious whether he would have been granted asylum if he had shown up at his initial hearing? Do I — do we challenge — Challenge whether — So are we — are we making the argument that he would not have been granted it? Right. No, we're not making that argument, because there isn't a basis. The agency didn't consider whether he would have been granted asylum under the question of was he prejudiced by his attorney's actions. So that's — so we're not — we're not contending that, you know, that there's no prejudice. And I — we can't make the parties do anything they don't want to do. I just suggest this because while the legal parts of this case I can analyze and rule one way or the other on, when I step backwards from it and look at the big picture, it's disturbing. I mean, I certainly wouldn't object if the Court wanted to refer the case to mediation if that's — We'll take good — we'll take careful note of that. But why don't we address the remaining petitions? The 13 — Yes. The fourth petition. So the fourth petition. I think we all sort of agree the second — the second one is nothing new, or the second one is nothing new. The third one is nothing new. You could talk about the father's death. I mean, was that a basis? I mean, did the BIA accept if — I guess the argument is that if I.J. and the BIA didn't accept what he said is true, because if they would have, they would have found that he met his prima facie case. What he said — what he said is that he — it's merely his belief that he believes that his father was murdered. He did submit the airline ticket showing that the father went over at the end of October. There's a death certificate that shows that he died, I think it's November 6th of 2006. But apart from that, there's nothing. There's no statements from anyone who was with the father. The only other thing, and I would not normally point to an article from Wikipedia, but this is something that he submitted with his motion to reopen with the immigration judge, and this is the Wikipedia. So I'm citing it only because it's something that he submitted. And it might have gotten better since it was submitted, right? I mean, somebody might have been — It might have been more reliable, but this article says that the — that Mr. Ossetrian's father died. He was at a baptism being the godfather of an Armenian family. The fatal attack happened at about 7 o'clock local time. He didn't show early symptoms. He was in a good and warm mood and surrounded by close relatives. So his own evidence really contradicts his claim that his father was murdered. Put that aside and concentrate then on the other so-called new evidence. Tell us why that wasn't sufficient. Well, his original asylum application was based on his political activities when he was in Armenia. And page 366 and 367 of the record, he says he was threatened by the government because of his political opinion. And his new — this new motion to reopen in the 13 case was based on his political activities in the United States. So the first asylum application was his political activities in Armenia. The second one is his political activities in the United States. And basically he's saying, I've become more famous, and so now I'm more at risk. And that's a change in his personal circumstances. That has — that's linked to his condition, to what he's claiming is the problem in Armenia. But he — but he has to show that conditions in Armenia are — Well, he points to the — they were pointing — counsel was pointing to change in the government and whatnot. But he — but he's — but he's not shown — I mean, there may be a different government, a different president, but it's still — he's still, you know, his involvement is with the — with the opposition, with seeking democracy. So he's involved in trying to get a democratic form of government. But you're saying that he has to show changed country conditions? He — Rather — rather because this is a motion to reopen? Yes. That's correct. And so it's not — it's not enough to show that the danger to him has increased? That's correct. If the country conditions haven't changed. That's correct. Is that — is that an accurate statement of law? Yes. He has to show that the conditions in the country were qualitatively different than they were at the time of his initial proceeding. And that is from a case of this Court. That's a, quote, Najmabadi, 597. Those changed country conditions aren't as they relate to him, but simply objectively in the country? I'm not sure I can find that our case law addresses that. But Judge Pais asked the question. I think you said it correctly. This situation may be worse because he's higher profile, but you're saying it doesn't matter because the country hasn't really changed. That's your position? That's our position, that his higher profile is that — is his change in personal circumstances. You know, I'm more famous, so I'm at more risk. But he's still got to show — and even from the evidence that he submitted with his first motion to reopen the country conditions show that the government was harassing political opponents, and that was still the case with the country reports that he submitted for 2010 and 2011. So — and then even beyond this hurdle of showing changed country conditions, he's got to show prima facie eligibility for relief. And so the affidavits and the things that he submitted, it's not that the Board was making an adverse credibility determination and saying, I don't believe it. It's that the statements in his affidavit are conclusory. You know, I'm sure — I'm sure that I — if my family would return to Armenia, our lives would be at risk, and we would be immediately subjected to arrest, beatings, mixed treatment, and finally murder. The statement from Rudy Armani, under — upon return to Armenia, Tigran Ossetrian will appear under severe pressure and persecutions. His family will be persecuted, most probably arrested or even killed. And the letter from the brother really doesn't even contain any — any threats against Mr. Ossetrian. The police came to his house and yelled and scared the kids. So it's not a question of, you know, whether the — whether his evidence should be believed, but whether it's enough to show prima facie eligibility for relief. And the Board said that it was — it was vague and speculative. And so our position is that that's not an abuse of discretion. Okay. Anything else? Okay. Thank you. This is a challenge to argue. We have four motions that are being argued. Your Honor, I'll try to be as brief as possible in my rebuttal. Your Honor, with regard to the — again, the last motion, which I feel strongest about, basically there are changed country conditions in this case. And under Chandra, the quote directly is that it can't be based solely on personal circumstances, but changes in country conditions made relevant by changes in Respondent's personal circumstances is sufficient. But why — how do we — what's the evidence of changed country conditions? There's numerous, and I'll just summarize it quickly. Now, there's been a change in administration, but — Change in administration. That doesn't — that, to me, doesn't vote for the worst. Sometimes — sometimes in the United States, we have changed country conditions, and in the change in President, it gets better. That's very true. In this case, if you look at the country reports, Your Honor, it got significantly worse. And under this circuit's case law, getting worse, it doesn't have to be complete change in conditions. Just worsening of conditions is sufficient. There was the March 1st incident where, during 100,000 people in the demonstration, police attacked, killed protesters. There was the article about how the diocese is being asked — granted, it was in France, but around the world, it says, being asked to spy by the Ministry of Internal Affairs on its citizens abroad. So that pertains to Mr. Asadorian's activities. But don't we have to deal with the baseline at whatever point in time we measure from, right? So you say we measure from — 2004. 2004. So what demonstrates that it's different than it was? These are all disturbing incidents. What demonstrates that it's different than it was in 2004? And we have this normal problem in these reopening cases, which is, of course, had you had a hearing, you would have just — you would have demonstrated the baseline. But now I think you've got it demonstrated in your motion to reopen, so how does the baseline change? How does it change from the baseline? Well, the only baseline that we can compare it with is that it's a change in the regime. It hasn't gotten better. It's gotten worse. Because there are attacks on protesters and so forth, which are not in the 2004 country reports. Granted, it's always been bad in Armenia, but it gets significantly worse. There are the article, newspaper article, which is a country condition about what Respondent is doing, published in Armenia. The police came to the house. Granted, they yelled and scared the kids, but they also said stuff that's in his affidavit about his political activities. That's a changed country condition as it relates to his personal circumstances as well. But wasn't he alleging back in 2004 that he would have been persecuted for his political activities? As it says in Malti decision, Your Honor, it's always going to relate to the initial claim, but it's getting significantly worse. Right now, if he goes back, because of the recent changes in his circumstances and in country conditions, it's going to be much worse for him than it was 11 years ago in 2004. That's indisputable, I think, in this case. And with regard to the other issue, Your Honor, with regard to — well, basically, also, Your Honor, in this case, there is the issue of whether or not the country reports. The country reports do indicate also that the police impunity, especially the 2010 report, indicates that it's increased the police impunity, brutality towards protesters. I'm not sure if the Court can take judicial notice of this year's country conditions, but there's very severe incidents happening in Armenia today, in fact, towards opposition members. So — And he would be viewed as an opposition member? Absolutely. Absolutely. And he would be much worse shaped today than he was in 2004 under Robert Kocharyan's regime versus today's Serzh Sargsyan regime, even though it's the same party in power. So we think it should be remanded for that. How about the — do you have any further say on that, on the first petition? Regarding the ineffective assistance, I think we'll rest on that, Your Honor. Okay. Thank you. Thank you. Thank you, counsel. We appreciate your arguments. Thank you very much. And we'll consider the — Fitch-Morgia's suggestion about the further mediation. Yes, sir. Thank you.
judges: Paez, Murguia, Hurwitz